# STATE OF MICHIGAN

# COURT OF APPEALS

In re J T JONES, Minor.

UNPUBLISHED
April 28, 2016

No. 328300
Wayne Circuit Court
Family Division
LC No. 13-514528-NA

Before: BECKERING, P.J., and OWENS and K. F. KELLY, JJ.

PER CURIAM.

Respondent appeals as of right an order terminating her parental rights to the minor child, JTJ, pursuant to MCL 712A.19b(3)(b)(*i*) (child has suffered physical injury as a result of the parent's act and a reasonable likelihood exists that the child will suffer additional injury if placed with the parent), (b)(*ii*) (child has suffered physical injury and the parent who had the opportunity to prevent the physical injury failed to do so), (c)(*i*) (more than 182 days passed since the initial dispositional order and the conditions that led to the adjudication continue to exist), (g) (the parent, without regard to intent, failed to provide proper care or custody), (j) (there exists a reasonable likelihood of harm if the child is returned to the parent's home), and (k)(*iii*) (the parent abused the child and the abuse included battering, torture, or other severe physical abuse). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

JTJ was removed from his parents' care when he was only two months old, after respondent noticed that his arm was, in her words, "swollen,"[1] and had taken him to the emergency room. A physical examination revealed that the child suffered a litany of injuries, including 28 fractures that were in various stages of healing, meaning that they were likely caused at different times. In addition to the broken bones, the child's eyelids were swollen and he had hemorrhages in the whites of both of his eyes. The child also suffered from a torn frenulum (the tissue that connects the upper lip to the gum), blisters on the neck, back, and

---

[1] The record indicates that the child's arm was severely injured. Approximately two months after the emergency room visit, the child was unable to move the injured arm because it was still bent behind him. Approximately nine months after the emergency room visit, the arm was characterized as still protruding and not fully healed.

thighs, discoloration—possibly indicative of a bruise—on the chest, diaper rash, a yeast infection on the neck, and thrush in the mouth and lips. The child's injuries were horrific, and his growth and development were stunted from the trauma he sustained.

At the time respondent took the child to the emergency room, the child was in the care of three individuals: respondent, the maternal grandmother, and the child's father.[2] None of the caregivers provided any explanation for the cause of the child's injuries. Dr. Mary Lu Angelilli, an expert in pediatrics, testified that the injuries were nonaccidental and were the product of abuse. According to Dr. Angelilli, it was "possible, but not likely" that the JTJ's caregivers would not have known about the injuries. Although the fractures—aside from the arm injury—did not present externally, the child nevertheless had hemorrhages in his eyes that would have been apparent to a caregiver. In addition, although the child was not continuously crying at the hospital, Dr. Angelilli testified that the child "would have been crying in pain a lot," given the nature and severity of his injuries. The child also indicated pain when his left arm and left leg were touched.

After a referee recommended termination of respondent's parental rights, the circuit court denied the recommendation to terminate parental rights. As a result, petitioner established a service plan for respondent. The plan, as adopted by the court, required respondent to: (1) attend individual therapy; (2) attend a psychological and a psychiatric evaluation; (3) attend parenting-time visits; (4) participate in the child's physical therapy and to attend medical appointments; (5) participate in the child's appointments with "Early On," which were designed to address the child's developmental delays caused by the severe physical abuse; (6) maintain suitable housing separate from the maternal grandmother; (7) attend all court hearings; (8) maintain a legal source of income; and (9) cooperate with petitioner.

During the 19 months that this case was pending, respondent made some progress with the services plan. She attended therapy, completed her psychological and psychiatric evaluations, and attended parenting time. She also attended some, but not all, of the child's medical appointments, most of which were required because of the physical abuse the child suffered. However, she missed many of the appointments. For instance, respondent missed some of JTJ's physical therapy appointments, missed some of his appointments with specialists, and missed the majority of his Early On appointments. Respondent also attended some, but not all, of her parenting-time visits with the child. With regard to employment, respondent obtained a job, but failed to consistently provide caseworkers with verification of her employment. As to housing, respondent secured an apartment, provided verification of a lease to caseworkers, and moved into the apartment only a few days before the final day of the termination hearing.[3] The caseworker who was primarily responsible for respondent's case testified that respondent had not scheduled a home assessment, despite being asked to do so when she moved into the apartment.

---

[2] The circuit court also terminated father's parental rights; he has not appealed the court's order.

[3] The circuit court adjourned the termination hearing multiple times, including one time because respondent failed to appear for the hearing.

At the termination hearing, respondent testified that her lack of attendance at JTJ's medical appointments and Early On appointments was caused, in large part, by transportation issues. Although she admitted that petitioner provided her with bus passes, she testified that it was difficult to take buses from Detroit, where she lived, to Troy, where she worked, and to Southgate and Dearborn, where some of the appointments occurred, in a single day. Respondent acknowledged that JTJ suffered severe physical abuse while he was in her care, but she gave no explanation for his injuries. She also acknowledged that the abuse caused the child to suffer from developmental delays; however, she also postulated that being placed in foster care caused some of the child's delays.

## II. ANALYSIS

Respondent argues that the circuit court clearly erred by finding statutory grounds for termination and by finding that termination was in the child's best interests. We disagree. We review for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction a mistake has been made." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). For termination of parental rights, the trial court must find that at least one of the statutory grounds set forth in MCL 712A.19b has been met by clear and convincing evidence. *In re Terry*, 240 Mich App 14, 21-22; 610 NW2d 563 (2000).

## A. STATUTORY GROUNDS

The Legislature has enumerated specific conditions, one or more of which must be proved before a court is permitted to terminate a parent's rights to her child. MCL 712A.19b(3). The petitioner bears the burden of establishing the existence of at least one of those grounds by clear and convincing evidence. *In re Trejo Minors*, 462 Mich 341, 350; 612 NW2d 407 (2000); *In re Fried*, 266 Mich App 535, 540-541; 702 NW2d 192 (2005). In the instant case, the circuit court found that six grounds for termination had been proven by clear and convincing evidence—MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (c)(*i*), (g), (j), and (k)(*iii*). In relevant part, MCL 712A.19b(3) states:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

(*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child and the abuse included 1 or more of the following:

\* \* \*

(*iii*) Battering, torture, or other severe physical abuse.

Although we agree with respondent that there was never any evidence that she perpetrated the abuse, we nevertheless affirm the circuit court's conclusion that there was clear and convincing evidence of statutory grounds for termination. Subsection (b)(*ii*) provides for termination where the parent had the opportunity to prevent physical injury to the child, but failed to do so, and there is a reasonable likelihood that the child would suffer physical injury or abuse in the foreseeable future if placed in the parent's home. Here, there was ample evidence that the child suffered severe physical injuries and that respondent had the opportunity to prevent the injuries. Notably, the child was in the care of three individuals living in the same house: respondent, the child's father, and the maternal grandmother. There is no indication in the record

that respondent was away from the home for long periods of time during the two months when the abuse occurred. There is also evidence to support a finding that respondent knew about the physical abuse JTJ was suffering and that she failed to protect him from it. Dr. Angelilli testified that, based on the extent of JTJ's injuries, he would have been in pain and crying out frequently. There were also other external signs of physical abuse and neglect that should have alerted respondent to JTJ's suffering, such as diaper rash, a yeast infection on his neck, thrush in his mouth, a torn frenulum, and hemorrhages in both eyes. His arm was bent and badly injured and he cried out when his left leg was touched. Dr. Angelilli also testified that JTJ's injuries were in various stages of healing, meaning that they were inflicted at different times. The ongoing manner in which the injuries were inflicted on two-month-old JTJ is evidence that respondent failed to protect the child.

There was also a reasonable likelihood that the child would suffer injury or abuse in the foreseeable future if placed in respondent's home. Although it is apparent that respondent no longer lived with the maternal grandmother—who was one of the suspected abusers—there was some evidence that she maintained ties with the child's father—one of the other suspected abusers—despite representing at numerous times that she was not doing so. For instance, JTJ's foster mother recalled conversations indicating that father and respondent were making decisions together, despite numerous warnings issued to respondent against such interactions. In addition, and of particular significance, respondent repeatedly failed to provide any information as to how the child was injured. She even appeared to minimize, at times, the substantial effect that the child's injuries had on his development, speculating that perhaps the child's placement in foster care could have contributed to his delays. Further, respondent failed to attend numerous medical appointments that were necessitated by the child's significant injuries. She also missed dozens of Early On appointments at which she could have learned valuable information about the special care needed for JTJ.

In sum, respondent failed to provide any explanation for the multitude of heinous injuries inflicted on the child, appeared, at times, to minimize the effect of the child's injuries, and failed to avail herself of the majority of the services and appointments designed to help treat the child's injuries and the lasting effect of those injuries.[4] On this record, we cannot conclude that the circuit court clearly erred by finding that a statutory ground for termination existed pursuant to MCL 712A.19b(3)(b)(*ii*). See *In re Ellis*, 294 Mich App 30, 34-36; 817 NW2d 111 (2011) (holding that where the child suffered numerous, nonaccidental injuries, there were grounds for termination even without being able to identify the perpetrator of the abuse when it was apparent that the conditions of § (3)(b)(*ii*) were satisfied). And, for many of the same reasons, we find no clear error in the circuit court's conclusion that respondent failed to provide proper care and custody and that there was no reasonable expectation that she would be able to do so within a reasonable time, see § (3)(b)(g), and that there was a reasonable likelihood the child would be

---

[4] Although respondent testified about transportation issues with attending the appointments and that she missed appointments because of her employment, the record reveals that petitioner gave respondent bus passes, that she missed some appointments before obtaining employment, and that she failed to consistently provide verification of her employment.

-5-

harmed if returned to respondent's care, see § 3(b)(j).  See *In re Ellis*, 294 Mich App at 34-36; *In re VanDalen*, 293 Mich App 120, 139-140; 809 NW2d 412 (2011) (holding that although there was no evidence as to which parent perpetrated the abuse, there was clear and convincing evidence to terminate parental rights under §§ 3(b)(g) and (j) where the children "as infants, suffered unexplained, serious, nonaccidental injuries consistent with intentional abuse while in respondents' sole care and custody," and the respondents "consistently denied having any knowledge of the cause of the children's severe, nonaccidental injuries.").[5]

## B.  BEST INTERESTS

"We review for clear error the trial court's determination regarding the child['s] best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).  "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 42-43; 823 NW2d 144 (2012) (internal citations omitted).  "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

The circuit court did not clearly err in finding that termination of respondent's rights was in the child's best interests.  It is undisputed that the child suffered horrific, nonaccidental injuries while he was in the care of respondent, the child's father, and the maternal grandmother. Although there was no evidence that respondent herself caused the injuries, there was ample evidence that she failed to protect the child from repeated abuse during the two months that he was in her care.  Respondent continually refused or failed to acknowledge how the child was injured.  The injuries inflicted upon the child caused significant developmental delays, and respondent failed to attend many of the child's medical and therapy appointments.  She also failed to participate in the Early On appointments, which were intended to help address some of the child's delays.

Although respondent made some progress in her court-ordered services plan and had a bond with the child, she failed to participate in or make progress in important aspects of the plan, such as attending the child's various appointments.  Further, although she testified that she obtained housing on the eve of the termination hearing and that she had obtained employment, she failed to consistently provide verification of her employment, and never had a home assessment completed at her apartment.  Respondent had nearly two years to make meaningful progress and to faithfully attend appointments, but she failed to do so.  In addition, the severity of the injuries the child suffered while in respondent's care cannot be overstated.  In light of these facts, in light of the child's need for permanency and stability, and in light of the child's

---

[5] Because "[i]t is only necessary for [petitioner] to establish by clear and convincing evidence the existence of one statutory ground to support the order for termination of parental rights," *In re Frey*, 297 Mich App 242, 244; 824 NW2d 569 (2012), we decline to address the remaining grounds for termination.

need for specialized care due to his injuries, the circuit court did not clearly err in finding that termination was in the child's best interests.  See *In re White*, 303 Mich App at 713.

Affirmed.

/s/ Jane M. Beckering
/s/ Donald S. Owens
/s/ Kirsten Frank Kelly